UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

MARGARET M. CARNAGUA, MILDRED B. )
SCHMIDT, HOWARD E. HUBER, and         )
DONALD K. ROYER, on behalf of themselves )
and all others similarly situated,            )
        Plaintiffs,             )
                                      )
vs.                               )     1:04-cv-1566-LJM-JMS
                                      )
LINK-BELT COMPANY, FMC CORP., and    )
PT COMPONENTS, INC.,              )
        Defendants,             )
_____)
UNITED STEEL WORKERS OF AMERICA,   )
AFL-CIO-CLC; USWA LOCAL 1999, and    )
MARGARET HARLESS, HOWARD          )
HARRINGTON, JOSEPH ROGERS, and     )
PAUL STAMMER, on behalf of themselves   )
and all others similarly situated,            )
        Plaintiffs,             )
                                      )
vs.                               )     1:03-cv-1029-LJM-JMS
                                      )
REXNORD CORPORATION,               )
        Defendant.             )

## ORDER ON DEFENDANTS' SUMMARY JUDGMENT MOTIONS

These causes are now before the Court on motions for summary judgment filed by

defendants, Link-Belt Company, FMC Corp., PT Components, Inc. ("PTC"), and Rexnord

Corporation (all defendants collectively, "Defendants"). The Court notes that on April 6, 2005, these

two causes were consolidated for purposes of discovery and pre-trial proceedings through the

resolution of dispositive motions. Plaintiffs,[1] Margaret M. Carnagua, Mildred B. Schmidt, Howard

_____

[1]United Steel Workers of America, AFL-CIO-CLC, and USWA Local 1999 (collectively,
the "Unions"), were also plaintiffs in Cause No. 1:03-cv-1029-LJM-JMS, however, by Order

E. Huber, Donald K. Royer (these plaintiffs, collectively, "Carnagua Plaintiffs"), Margaret Harless, Howard Harrington, Joseph Rogers, and Paul Stammer (these plaintiffs, collectively, "USWA Plaintiffs;" all plaintiffs, collectively, "Plaintiffs"), all of whom are retirees of one of Defendants, claim that Defendants breached certain collective bargaining agreements ("CBAs") when in October 2002 Rexnord informed retirees that their health benefits were being modified. The facts of this case apply equally to each Defendant; therefore, the Court addresses all of the arguments in this Order.

For the reasons stated herein, the Court **GRANTS in part and DENIES in part** FMC's Motion for Summary Judgment and **GRANTS in part and DENIES in part** PTC and Rexnord's Motion for Summary Judgment.


## I.  BACKGROUND

### A.  THE PARTIES

Plaintiffs are retired employees of either Link-Belt, FMC, PTC or Rexnord at two manufacturing facilities located in Indianapolis, Indiana (collectively, "Indianapolis plant"). Carnagua Compl. ¶¶ 2-9; USWA Compl. ¶¶ 2-9 (collectively, "Compls."). Plaintiffs are former bargaining unit employees and members of the Unions. *Id.* The USWA Plaintiffs filed their lawsuit against Rexnord on July 14, 2003. USWA Compl. The Carnagua Plaintiffs filed their lawsuit against Link-Belt, FMC and PTC on September 23, 2004. Carnagua Compl.

The original employer at the Indianapolis plant was Link-Belt, which merged with FMC in 1967. Carnagua Compl. ¶¶ 2-3. Link-Belt and the Unions had a 1964-1967 CBA, which included

---

dated October 25, 2004, this Court determined that the Unions lacked standing to assert the claims of the retirees.

a 1964 insurance agreement.  Pls.' Exs. 1 & 2.  In 1967, when FMC took over the Indianapolis plant,

it assumed Link-Belt's contractual obligations to persons covered under the CBA.  Pls.' Ex. 27.

FMC and the Unions negotiated CBAs for 1967-1970, 1970-1973, 1973-1976, 1977-1979,

and 1979-1982.  Pls.' Exs. 3, 6, 8, 10, 11.  In 1981, FMC sold the Indianapolis plant to PTC, which

operated the facility until 1988.  Carnagua Compl. ¶ 4.  PTC and the Unions negotiated CBAs dated

1982-1985, 1985-1988, and 1988-1991.  Pls.' Exs. 13, 15, 17.  In 1988, PTC sold the Indianapolis

plant to Rexnord, which has operated the facility since January 1, 1989.  Compls. ¶ 9.  Rexnord

assumed any liability owed retirees that PTC owed them under the CBAs.  Stipulation, Mar. 23,

2007.  Rexnord and the Unions negotiated CBAs dated 1991-1995, 1995-1998, 1998-2002, and

2002-2006.  Pls.' Exs. 19, 21, 23, 25.

Rexnord announced changes to Plaintiffs' health benefits in late 2002, which became

effective on January 1, 2003. Carnagua Compl. ¶ 25.  Plaintiffs contend that Rexnord's modification

of their health benefits constitutes a breach of a contractual obligation owed to them for lifetime

health benefits.  Compls. ¶¶ 24-25.


### B.  THE CBAs

The terms and conditions upon which the Plaintiffs are entitled to receive health insurance

benefits were set forth in the various CBAs in effect from 1964 through 2002 and various insurance

agreements[2] that were incorporated by reference into the CBAs.  Compls. ¶¶ 9-24; Pls.' Exs. 1-25.[3]

---

[2]The parties were unable to locate the insurance agreement dated 1977.

[3]Wherever practicable, citations to the relevant CBAs and supplement agreements follow Plaintiffs' citations.

The same article of the CBAs that addressed incorporation of the insurance documents also set forth the duration of the agreements. Pls.' Exs. 1, 3, 6, 8, 10, 11, 13, 15, 17, 19, 21, 23. Specifically, each of the CBAs contained either the same or substantially similar language stating:

**Article XVIII:  Termination**

1.1    SECTION 1. The terms and conditions of the Agreement shall remain in effect until midnight September 30, 2002.

1.2    This agreement shall automatically renew itself for yearly periods beginning October 1, 2002, unless either party at least 60 days prior to October 1, 2002, serves written notice on the other of modification or termination.  In the event of notice of modification, those portions of the Agreement not modified shall be considered as renewed.

1.3    This Agreement together with:

    a.    The Supplemental Agreement dated effective October 1, 1998; and

    b.    Any officially executed supplemental, amendatory, or interpretive side agreements shall constitute the entire Agreement of the parties hereto.

Pls.' Ex. 23, Art. XVIII, Sec. 1.3.  *See also* Pls.' Exs. 1, Art. XVI, Sec. 1.3; 3, Art. XVI, Sec. 1.4; 6, Art. XVI, Sec. 1.3; 8, Art. XVIII, Sec. 1.3; 10, Art. XVIII, Sec. 1.3; 11, Art. XVIII, Sec. 1.3; 13, Art. XVIII, Sec. 1.2; 15, Art. XVIII, Sec. 1.3; 17, Art. XVIII, Sec. 1.3; 19, Art. XVIII, Sec. 1.3, 21, Art. XVIII, Sec. 1.3.  The Supplemental Agreement corresponding to each CBA contained the insurance agreement.  Pls.' Exs. 2, 4, 5, 7, 9, 12, 14, 16, 18, 20, 22, 24.

## C.  THE INSURANCE AGREEMENTS

Each insurance agreement after the 1964 agreement had the same or similar language with respect to duration:

4

WHEREAS, the parties hereto, are parties to an Insurance Agreement dated October 1, 1998[,] which Insurance Agreement the parties desire to continue in full force and effect until midnight, September 30, 2002[,] and

* * *

NOW THEREFORE, IT IS AGREED as follows:

Effective October 1, 1998, for those employees eligible to participate, the Insurance Agreement has been revised in accordance with the terms and conditions set forth in the following Program of Insurance Benefits.  This mutually agreed to program constitutes a part of the Basic Labor Agreement dated October 1, 1998[,] as though incorporated therein.

Pls.' Ex. 24, at 79.  *See also* Pls.' Ex. 4, Art. II, Sec. 6.1 ("This Insurance Agreement shall be in full force and effect during the term of the current Basic Labor Agreement, of which it is incorporated as an exhibit, or for such additional periods as the Basic Labor Agreement might be extended in accord with Article XVI, Termination of the Basic Labor Agreement."); Pls.' Exs. 7, Art. 8.32; 9, Art. 8.32; 12, Art. 8.31; 14, at 51; 16, Art. 8.33; 18, Art. 6.33; 20, Art. 6.33; 22, Art. 6.33; 24, Art. 6.32.

The insurance agreement in effect from 1964-1967, had different language:

SECTION 7.1.          Subject to the provisions of the succeeding paragraph, this Insurance Agreement shall be in full force and effect from October 1, 1964, until September 30, 1967, and shall automatically be renewed under the same terms and conditions for consecutive three (3) year periods thereafter, unless sixty (60) days prior to September 30, 1967, or prior to the end of any such three (3) year period thereafter, either party gives written notice by registered mail to the other party of termination of this Insurance Agreement.

Pls' Ex. 2, Sec. 7.1.

Furthermore, the agreement between Link-Belt and FMC to merge in April 1967 contained the following provision related to employee benefits:

5

> On the effective date of the merger, FMC shall be substituted for Link-Belt as the employer under all employee benefit plans of Link-Belt and assume all of Link-Belt's obligations thereunder as of the effective date of the merger.  All of Link-Belt's right, title and interest in and to such plans shall be vested in FMC.  From and after the effective date of the merger, said plans shall be continued in full force and effect for the employees of Link-Belt immediately prior to such date; provided, however, that nothing contained herein shall in any way limit the right of FMC to amend or terminate any of said plans at any time to the same extent that Link-Belt had a right to do so on the effective date of the merger, or thereafter might have secured a right to do so.

Pls.' Ex. 27, Art. I, ¶ C.

Beginning in 1970, each insurance agreement in effect during the time that FMC operated the Indianapolis plant stated:

> 8.2        *Financing*.  The Company will pay the full cost of the Insurance Program for active employees, employees who retire after November 1, 1976, and their eligible dependents.

Pls.' Ex. 7, Art. VIII, Sec. 8.2.  *See also* Pls.' Exs. 9, Art. VIII, Sec. 8.2; 12, Art. VIII, Sec. 8.2.  The FMC insurance agreements also had a separate provision for employees who retired before November 1, 1967.  *See, e.g.*, Pls.' Ex. 4, Art. I, Sec. 3.2.

Each insurance agreement contained provisions regarding the cost of medical insurance for retired employees, which changed over time.  For example, the 1998 insurance agreement stated:

> **6.2     Financing.**  The Company will pay the full cost of the insurance [p]rogram for active employees, employees hired prior to October 1, 1991[,] who retire after November 1, 1967, and their eligible dependents, less employee or retiree contribution as provided under 6.31 of Article VI.

Pls.' Ex. 24, Art. VI, Sec. 6.2.  *See also* Pls.' Exs. 2, Secs. 3.1 & 3.2; 4, Art. I, Sec. 2.1; 7, Art. VIII, Sec. 8.2; 9, Art. 9.20; 12, Art. 9.20; 14, Art. 9.20; 16, Art. 9.20; 18, Art. 6.2; 20, Art. 6.2; 22, Art. 6.2; Pls.' Ex. 4, Art. I, Sec. 2.1.

Starting with the insurance agreement in effect in 1967, either the program booklet or the

insurance agreement itself contained the following or substantially similar language:

> 9.0 The following provisions relate to those employees who retired prior
> to November 1, 1967, and their eligible dependents.  Other provisions of this
> booklet do not apply to these retirees.

Pls.' Exs. 5, Art. IX, Sec. 9.0; 7, Art. IX, Sec. 9.0; 9, Art. IX, Sec. 9.0; 12, Art. IX, Sec. 9.0; 14, Art.

IX, Sec. 9.0; 16, Art. IX, Sec. 9.0; 18, Art. VII, Sec. 7.0; 20, Art. VII, Sec. 7.0; 22, Art. VII, Sec. 7.0;

24, Art. VII, Sec. 7.0.


### D.  OTHER RELEVANT CONTRACTUAL COMMITMENTS

The pension plan was also included in the supplemental agreements incorporated by

reference into the CBAs.  *See, e.g.*, Rexnord Exs. C, L, R, T, U.  For example, the October 1, 1967,

supplemental agreement stated the following with respect to pension benefits:

> 1.1 **Section 1.**  *Guarantee of Benefits.*  The Company agrees to pay, or
> cause to be paid to each pensioner retired on or after October 1, 1967, the
> pension or disability benefits, as the case may be, provided for in this Pension
> Agreement, as they become due to him each month for the remainder of his
> life or for such shorter period as provided by this Pension Agreement.

> 2.1 **Section 2.**  *Vesting.*  No one shall have any vested rights to benefits
> under this Pension Agreement except such benefits as shall be due and
> payable to the pensioner (or copensioner) as the result of the pensioner being
> retired under the terms of this Pension Agreement during its effective period,
> and except as otherwise provided in Section 4 of Article V of this Pension
> Agreement.

Rexnord Ex. L, Ex. C, Pension Agreement, Art. XI, Secs. 1.1 & 2.1.  In addition, the October 1,

1967, pension agreement provided:

> 2.1 Section 2.  *Previously Retired Pensioners.*  The benefits provided
> for in this Pension Agreement shall be payable only with respect to

7

> employees retired on or after October 1, 1967.  Pensioners retired prior to October 1, 1967, shall have their pension or disability benefits determined in accordance with the terms of the Pension Agreements between the parties hereto dated March 1, 1950, September 27, 1954, April 1, 1958, October 1, 1960, and October 1, 1964, as applicable, except as otherwise provided in the Letter of Intention dated September 30, 1956, and the Letter dated October 1, 1960.

*Id.* Art. XII, Sec. 2.1.

The October 1, 1998, supplemental agreement provided the following with respect to pension benefits:  "A Participant shall have a nonforfeitable right to his Retirement Benefit upon attainment while an Employee of the Plan's Normal Retirement Age, which is age 65."  Rexnord Ex. U at 11. With respect to benefits under any earlier retirement plan, the 1998 supplemental agreement provided:

> **Previously Retired Pensioners.**    The benefits provided for in this Pension Agreement shall be payable only with respect to employees retired on or after October 1, 1998,.  Pensioners retired prior to October 1, 1998[,] shall have their pension or disability benefits determined accordance with the terms of the Pension Agreements, between the parties hereto date March 1, 1950, September 27, 1954, April 1, 1958, October 1, 1960, October 1, 1964, October 1, 1967, October 1, 1970, October 1, 1963, February 14, 1977, October 1, 1979, October 1, 1982, October 1, 1985, October 1, 1988, October 1, 1991[,] and October 1, 1995, as applicable, except as otherwise provided in the Letter of Intention dated September 30, 1956, and Letter dated October 1, 1960.

*Id.* at 41.

## E.  REXNORD CHANGES RETIREE HEALTH BENEFITS EFFECTIVE JANUARY 1, 2003

On September 23, 2002, Tom Smith ("Smith"), Rexnord's Vice President of Human Resources, informed James Adcock ("Adcock"), the Union Staff Representative, that Rexnord would

not bargain about anything concerning retired employees, including their medical benefits. Smith

Aff. ¶ 6. In a letter dated September 25, 2002, Smith wrote to Adcock stating, in part:

> This letter is in response to your letter of September 23, 2002[,] and will confirm our discussion in which I informed you on behalf of Rexnord, that the company has decided to modify retirement benefits applicable to current retirees. As you know on September 30, 2002, the current collective bargaining agreement will expire. At the same time, any and all provisions relating to medical benefits for current retires will also expire. We both acknowledge the fact that retiree medical benefits for current retirees is a permissive subject of bargaining. However, because of the cooperative relationship we have enjoyed over the years, I want to keep the union informed of the company's intentions to change the benefit design features and cost sharing provisions [that] we believe will become effective January/February, 2003. . . .

* * *

> . . . Within the context of our current negotiations for a successor agreement, Rexnord is no longer willing to discuss language in the new Agreement that addresses medical benefits for current retirees. . . .

Rexnord Ex. Z.

After the new collective bargaining agreement became effective on October 1, 2002, on

October 17, 2002, Smith sent letters to the Indianapolis plant retirees informing them of the three

health insurance policy options that would be available to them effective January 1, 2003, some of

which would be available at no cost to some retirees. Smith Aff. ¶ 8, Exs. A & B. Smith explained

that Rexnord needed to reduce its liability for the cost of retiree healthcare plans to stay competitive.

*Id.* But, rather than eliminating retiree healthcare benefits in their entirety, Rexnord was going to

offer retirees a choice between three options, which varied depending on age and level of retiree

contribution. *Id.* The new retiree healthcare program would allow retirees to change their

enrollment once a year. *id.* The letter also advised retirees that they could obtain more information

about their options at planned meetings. *Id.*

9

## II.  SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990).  Motions for summary judgment are governed by Federal Rule of Civil Procedure 56 (c) ("Rule 56(c)"), which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).  When the moving party has met the

10

standard of Rule 56, summary judgment is mandatory.  *See Celotex*, 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party.  *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996).  The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment.  *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996).  Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute.  *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).  "If the nonmoving party fails to establish the existence of an element essential to [its] case, one on which [it] would bear the burden of proof at trial, summary judgment must be granted to the moving party."  *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

### III.  <u>STATUTE OF LIMITATIONS</u>

The parties dispute the applicable statute of limitations for Plaintiffs' claims.  Plaintiffs contend that their claims brought pursuant to § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, are most closely analogous to breach of contract claims in Indiana; therefore, the Court should apply the Indiana statute of limitations for breach of contract.  In contrast, Defendants argue that the Court should apply the statute of limitations found in § 10(b) of the National Labor Relations Act ("NLRA") to Plaintiffs' § 301 claims because the U.S. Supreme Court

has determined that such claims are more closely analogous to a charge of unfair labor practices under the NLRA than to any state law claim.

After reviewing the case law and keeping in mind the Court's prior ruling relative to the Unions' attempt to compel arbitration, the Court concludes that Plaintiffs' claims are more closely analogous to breach of contract actions than a union's action or a union member's action to compel arbitration.  In *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151 (1983), the Supreme Court addressed the appropriate statute of limitations for § 301 claims against both an employer, for breach of a CBA, and an union, for failure to fairly represent.  *Id.* at 154.  The *DelCostello* Court noted that in cases where there is no express statute of limitations, like in § 301 cases, the federal courts generally apply the most closely analogous statute of limitations under state law.  *Id.* at 158.  However, "[i]n some circumstances . . . state statutes of limitations can be unsatisfactory vehicles for the enforcement of federal law.  In those instances, it may be inappropriate to conclude that Congress would choose to adopt state rules at odds with the purpose or operation of federal substantive law." *Id.* at 161.  In doing so, the *DelCostello* Court distinguished its prior ruling in *Auto Workers v. Hoosier Corp.*, 383 U.S. 696 (1966), which the *DelCostello* Court characterized as "a straightforward suit under § 301 . . . for breach of a collective bargaining agreement by an employer . . . [that] did not involve any agreement to submit disputes to arbitration . . . [and] was brought by the union itself rather than by an individual employee." *Id.* at 162.

The plaintiffs in *DelCostello* were employees who were represented by the union in the collective bargaining procedure and who were bound by any grievance or arbitration remedies provided in the relevant CBAs.  *Id.*  Generally, then, the most analogous state law statute of limitations would be the statue for vacation of an arbitration award, which typically provides for a

very short time frame in which to sue. *Id.* at 165-66. But, the *DelCostello* Court reasoned that, in the circumstances where an employee was suing both his employer and his union, the state statutes in this area "failed to provide an aggrieved employee with a satisfactory opportunity to vindicate his rights under § 301 and the fair representation doctrine." *Id.* at 166.

The *DelCostello* Court then balanced the need of the employee to have enough time to find help to proceed with his claim with the goal of federal labor law to foster the rapid and final resolution of labor disputes. *Id.* at 167-68. In doing so, the Supreme Court determined that state statutes did not provide for an analogous balance; therefore, the Supreme Court would look to federal labor law, which was "actually designed to accommodate the balance of interests very similar to that at stake" in the circumstances before it. *Id.* at 169. Section 10(b) of the NLRA provided such an analogous balance because it addressed charges of unfair labor practices, just like those the *DelCostello* plaintiffs alleged under § 301. *Id.* at 169-71.

In adopting § 10(b), however, the *DelCostello* Court stressed that its holding

> should not be taken as a departure from prior practice in borrowing limitations periods for federal causes of action, in labor law or elsewhere. . . . [R]esort to state law remains the norm for borrowing of limitations periods. Nevertheless, when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking, [courts should] not hesitate[] to turn away from state law.

*Id.* at 171-72.

After *DelCostello*, the Seventh Circuit adopted a two-step approach for determining the appropriate statute of limitations in a § 301 suit: 1) the Court must determine whether federal law provides a more closely analogous limitations period than any state statute; 2) the Court should choose a federal limitations period if federal policies and the practicalities of litigation make that

statute of limitations more appropriate. *See Johnson v. Graphic Commc'ns Int'l Union*, 930 F.2d 1178, 1181 (7th Cir. 1991). In *Johnson*, the Seventh Circuit adopted the § 10(b) standard for pure § 301 claims alleging that a union had breached its duty of fair representation. *Id.* at 1182. However, in *International Union of Elevator Constructors v. Home Elevator Co.*, 798 F.2d 222 (7th Cir. 1986), the Seventh Circuit adopted the breach of contract statute of limitations from state law for a pure § 301 claim alleging that an employer had breached the collective bargaining agreement.

Applying the analytical framework to the facts here makes obvious that the retirees' claims in this case do not involve allegations that the Unions breached their duty of fair representation. Rather, Plaintiffs' claims are more like those of the retirees in *Allied Chemical and Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157 (1971), that challenged an employer's right to change a term that was a permissive subject of bargaining. That is exactly what Plaintiffs allege in this case.

Furthermore, earlier in USWA Plaintiffs' suit, defendant, Rexnord, successfully argued that the Unions did not have standing to represent Plaintiffs in their suit against Rexnord to compel arbitration under the 2002 CBA, in part, because the Union had not represented the interests of the retirees in drafting the CBA. In other words, the Court agreed with Rexnord that the retirees' claims against it for unilaterally changing their benefits was not a mandatory subject of bargaining, rather, the retirees and Rexnord had to agree to allow the Unions to represent the retirees' interests and there was no evidence that either USWA Plaintiffs or Rexnord had done so. There has been no new evidence presented to the Court to change its prior opinion that the terms of the retirees' benefits were not subjects negotiated by the Unions and Rexnord under the 2002 CBA. As a result,

14

Plaintiffs' claims are not closely analogous to a breach of fair representation claim; they are more analogous to a breach of contract claim.

Finally, unlike the situation in *DelCostello*, Plaintiffs' claims here do not present issues related to the ongoing relations between union members and their employer. Plaintiffs' rights, while derived through CBAs and various benefit documents incorporated therein by reference, would not have a serious effect on the day-to-day working environment of the company. As such, there is no overriding need to choose a federal limitations period. As previously stated, this action is more akin to a breach of contract action than to one that implicates a breach of the fair duty of representation.

Turning now to the appropriate statute of limitations for this § 301 action, Indiana has three limitations periods for breach of contract actions: a two-year statute of limitations for employment-related actions not based on a written contract, *see* Ind. Code § 34-11-2-1; a six-year statute of limitations for breaches of contracts not in writing, *see* Ind. Code § 34-11-2-7; and a ten-year statute of limitations for breaches of written contracts, *see* Ind. Code § 34-11-2-11. In other § 301 suits involving a straightforward breach of contract claim, the Seventh Circuit has applied Indiana's two-year limitations period for employment actions. *See Jones v. Gen'l Elec. Co.*, 87 F.3d 209, 213 (7th Cir.), *cert. denied* 519 U.S. 1008 (1996); *Int'l Union of Elevator Constructors v. Home Elevator Co.*, 798 F.2d 222, 229-30 (7th Cir. 1986). In doing so, the Seventh Circuit reasoned that, like in *Hoosier Cardinal*, 383 U.S. at 706, a § 301 claim by an employee against his or her employer is not based exclusively on a written instrument, but also on the separate hiring contract for that employee, which may or may not be based on a written instrument. *Home Elevator*, 798 F.2d at 229-30. In addition, the shorter limitations period for such agreements was "consistent with the federal labor policy [that]

encourages rapid resolution of labor disputes and the contractual agreement to submit grievances to arbitration." *Id.* at 230.

The Court concludes that Indiana's two-year statute of limitations for employment-related contracts not based in writing is the appropriate statute of limitations for Plaintiffs' claims in this case. Plaintiffs claim that Defendants breached the agreements they had for vested medical benefits under various CBAs, insurance documents and their individual employment agreements. The shorter two-year statute of limitations better serves the policy to encourage aggrieved individuals to quickly bring their claims to the attention of his or her employer and recognizes that each individual may have oral employment agreements that supplement the relevant written instruments that would change their damages. Furthermore, this statute of limitations is consistent with the choice of this statute for other similar cases in the Seventh Circuit, which would promote some uniformity in the law under § 301.

The parties also dispute the date upon which the statute of limitations should begin to run; however, given the Court's decision that a two-year statute of limitations applies to Plaintiffs' claims, all the claims were filed timely even if the Court applies the earliest proffered trigger date of September 25, 2002.

For the foregoing reasons, Defendants' Motions for Summary Judgment on the basis that Plaintiffs' claims are barred by the statue of limitations are **DENIED**.

## IV.  MERITS OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Turning to the merits of the parties' arguments, Defendants all argue that retiree health benefits did not vest for the lifetime of the retirees because the language of the CBAs, and the

16

insurance agreements incorporated therein by reference, is unambiguous when it limits the insurance agreements to the time frames of the relevant CBAs.  To the contrary, Plaintiffs argue that the language of the CBAs and corresponding health benefit documents have both patent and latent ambiguities such that the Court should consider extrinsic evidence.  The extrinsic evidence, Plaintiffs aver, shows that there is a material question of fact on the issue of vesting of retiree health benefits during the relevant time frames.  Although Plaintiffs have slightly different arguments relative to two sets of Defendants, Link-Belt/FMC ("FMC Defendants") and PTC/Rexnord ("Rexnord Defendants"), the similarities of the arguments makes simultaneous treatment of them more efficient.

Having reviewed the parties' arguments and evidence, the Court concludes that there is no ambiguity in the CBAs and insurance agreements, and that retiree health benefits did not vest prior to Rexnord's change in those benefits effective January 1, 2003.  The relevant Seventh Circuit law in this area is fairly settled.

> Unlike pension benefits under [the Employee Retirement Insurance Security Act ("ERISA")], insurance benefits, such as the benefits at issue in this case, do not automatically vest.  *See, e.g.*, *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 604-05 (7th Cir. 1993) (en banc), *cert. denied*, 510 U.S. 909, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993).  Unless a contract provides for the vesting of benefits, the presumption is that benefits terminate when a collective bargaining agreement ends.  *Bidlack*, 993 F.2d at 606-07; *Pabst Brewing Co. v. Carrao*, 161 F.3d 434, 439 (7th Cir. 1998) ("ERISA does not require the vesting of welfare benefits; if they vest at all, they do so under the terms of a particular contract.").

*Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir. 2006).  In other words, in the Seventh Circuit, there is a presumption that healthcare benefits do not exceed the life of an agreement.  *Id.* "This presumption can be rebutted by extrinsic evidence only if an ambiguity exists in the contractual language or if there is a 'yawning void . . . that cries out for an implied term.'"  *Id.* (quoting *Bidlack*, 993 F.2d at 608).

Further, the Seventh Circuit has enunciated the following standards for contract interpretation in this context:

1. If a collective bargaining agreement is completely silent on the duration of health benefits, the entitlement to them expires with the agreement, as a matter of law (that is, without going beyond the pleadings), unless the plaintiff can show by objective evidence that the agreement is latently ambiguous, that is, that anyone knowledgeable about the real-world context of the agreement would realize that it might not mean what it says. This is the *Bidlack* presumption and its latent-ambiguity rebuttal.

2. If the agreement makes clear that the entitlement expires with the agreement, as by including such a phrase as "during the term of this agreement," then, once again, the plaintiff loses as a matter of law unless he can show a latent ambiguity by means of objective evidence. This is a general rule of contract law, independent of but consistent with *Bidlack*.

3. If there is language in the agreement to suggest a grant of lifetime benefits, and the suggestion is not negated by the agreement read as a whole, the plaintiff is entitled to a trial. Of course, if the agreement expressly grants such benefits, the plaintiff is entitled, not to a trial, but to a judgment in his favor. We are speaking of a case in which merely suggestive language creates a patent ambiguity.

4. If the plaintiff is entitled to a trial by reason of either a patent or a latent ambiguity, the normal rules of evidence will govern the trial, and so the parties will not be limited at trial to presenting *objective* evidence of meaning.

*Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 547 (7th Cir. 2000). *See also Cherry*, 441 F.3d at 481-82 (quoting *Rossetto* with approval).

Plaintiffs contend that the separate treatment of health benefits for retirees in the insurance agreements creates a patent ambiguity with respect to the duration of the Defendants' obligation to provide health insurance benefits to Plaintiffs. More specifically, Plaintiffs argue that the health benefits for pre-1967 retirees were set off from those of current employees and other retirees, and that the language in that section clearly states that other provisions in the insurance agreement would not apply to those individuals. Moreover, Plaintiffs aver that the language used in the FMC

Defendants' insurance agreement to describe the health benefits available to employees who retired

on or after November 1, 1967, imply that health benefits would be provided for life.  Pls.' FMC

Resp. at 25-26 (citing Pls.' Ex. 5, ¶ 8.15 ("If you retire on or after November 1, 1967[,] under the

Company non-contributory Pension Plan, your Hospitalization, Physicians' Service, Major Medical

Benefits, and Life Insurance will be continued . . .), ¶ 8.18 ("Any retiree or dependent of a retiree

shall be covered, at and after age sixty-five (65), by a Program complementing Medicare Part A and

Part B . . . ."); Pls.' Ex. 7, ¶¶ 8.16, 8.19; Pls.' Ex. 11, ¶¶ 8.16, 8.18).

      The Court disagrees with Plaintiffs that the referenced language creates a patent ambiguity

about whether their medical benefits vested.  The language of the relevant CBAs, and the insurance

agreements incorporated therein by reference, make clear that the medical benefits terminated with

expiration of the CBAs.  The 1964 CBA states, in relevant part:  "The terms and conditions of this

Agreement shall remain in effect until midnight September 30, 1967."  Pls.' Ex. 1, Art. XVI, Sec.

1.1.  *See also* Pls.' Exs. 3, Art. XVI; 6, Art. XVI; 8, Art. XVIII; 10, Art. XVIII; 11, Art. XVIII; 13,

Art. XVIII; 15, Art. XVIII; 17, Art. XVIII; 19, Art. XVIII, 21, Art. XVIII; 23, Art. XVIII.  Moreover,

the 1964 insurance agreement stated: "[T]his Insurance Agreement shall be in full force and effect

from October 1, 1964, until September 30, 1967 . . . ."  Pls.' Ex. 2, Sec. 7.1.  Similarly, the 1967

insurance agreement stated: "This Insurance Agreement shall be in full force and effect during the

term of the Basic Labor Agreement, of which it is incorporated as an exhibit, or for such additional

periods as the Basic Labor Agreement might be extended . . . ."  Pls.' Ex. 4, Art. II, Sec. 6.1.

Subsequent insurance agreements stated, in relevant part:  "WHEREAS, the parties hereto, are

parties to an Insurance Agreement dated October 1, 1998[,] which Insurance Agreement the parties

desire to continue in full force and effect until midnight, September 30, 2002 . . . ."  Pls.' Exs. 24,

at 79; 4, Art. II, Sec. 6.1; 7, Art. 8.32; 9, Art. 8.32; 12, Art. 8.31; 14, at 51; 16, Art. 8.33; 18, Art. 6.33; 20, Art. 6.33; 22, Art. 6.33; 24, Art. 6.32.  This language expressly limits the terms of the health insurance agreements to the terms of the relevant CBAs and satisfies the standard required by the Seventh Circuit in *Bidlack* for employers that are "adamant against assuming perpetual obligations . . . ."  993 F.2d at 609.

Moreover, the phrases Plaintiffs cite to for evidence that the parties intended to vest healthcare benefits for a longer term, by their very nature, are clauses that describe what happens to health care benefits for employees who become eligible to retire during the lifetime of the agreement. The phrases cannot change the unambiguous intention to limit the term of the health benefits contained in the CBAs or the insurance agreements themselves.  This is not a case in which the CBAs and insurance agreements leave "gaps to fill or ambiguous terms to be interpreted." *Cherry*, 441 F.3d at 483.

Plaintiffs claim that the placement of the retiree healthcare benefit descriptions in sections separate from those of current employees and other retirees, in addition to the language found in the pre-1967 retiree section that limits health benefit provisions applicable to those persons, also create a patent ambiguity.  Those sections, Plaintiffs claim, are placed after the termination clauses, therefore, the termination clauses in the insurance agreements may not apply to retirees.  This inference, Plaintiffs assert, is supported by the following language with respect to pre-1967 retirees: "The following provisions relate to those employees who retired prior to November 1, 1967, and their eligible dependents.  Other provisions of this booklet do not apply to these retirees."  Pls.' Exs. 9, Art. IX, Sec. 9.0; 12, Art. IX, Sec. 9.0; 14, Art. IX, Sec. 9.0; 16, Art. IX, Sec. 9.0; 18, Art. VII, Sec. 7.0; 20, Art. VII, Sec. 7.0; 22, Art. VII, Sec. 7.0.

The Court disagrees with Plaintiffs' analysis.  First, the *Cherry* court specifically addressed whether the placement of retiree health benefits in separate sections implied that those benefits vested for life.  441 F.3d at 483.  The *Cherry* court found that the general nature of the limiting clauses of the insurance agreements in that case operated "as an overriding preamble for both active and retired employees."  *Cherry*, 441 F.3d at 483.  Similarly to the limiting clauses in *Cherry*, the limiting clauses here are general in nature and apply to the entirety of the insurance agreements.  The primary evidence that this is true is the integration clause of the CBAs.  The insurance agreements do not stand alone; rather, they are entirely incorporated into the CBAs, which by their terms, expire on a date certain.  Further, the placement of the limiting clauses of the insurance agreements in sections that either describe generally-applicable principles or in the preamble to the agreements evidence that the benefits contained therein expire with the insurance agreement.  Pls.' Ex. 4, Art. II, Sec. 6.1; 7, Art. 8.32; 9, Art. 8.32; 12, Art. 8.31; 14, at 51; 16, Art. 8.33; 18, Art.6.33; 20, Art. 6.33; 22, Art. 6.33; 24, Art. 6.32.

Additional evidence that the limiting language applies to the entirety of the insurance agreements is the fact that the provisions for health insurance are modified over time and continually appear in their entirety rather than referring retirees to previous CBAs or insurance agreements that were in place at the time they retired.  Unlike with retiree health benefits that reappear in each subsequent insurance agreement, for applicable pension benefits, retirees must refer to the CBA and supplemental agreements in place at the time they retired to find answers to questions about those benefits.  If Plaintiffs' health benefits were intended to vest for life, subsequent CBAs and insurance agreements would refer Plaintiffs back to the CBA and insurance agreement in place at the time

Plaintiffs' retired rather than repeat the benefit again, sometimes in modified form, in the new agreements.

Moreover, as Defendants point out, the parties knew how to vest benefits because they did so for pension benefits in another supplemental agreement incorporated into each CBA.  *See, e.g.*, Rexnord Exs. C, L, R, T, U.  The language used in the pension benefit provisions clearly make the pension benefits guaranteed for the lifetime of the retiree.  *See, e.g.*, Rexnord Exs. L, Ex. C, Pension Agreement, Art. XI, Secs. 1.1 & 2.1; *id.* Art. XII, Sec. 2.1; U, at 11, 41.  There is no similar language in the retiree health benefit sections or anywhere in the insurance agreements.

Finally, in the context of the entirety of the agreements at issue, the language excluding pre-1967 retirees from coverage under other provisions of the insurance agreement operate to ensure that pre-1967 retirees understand that their health benefits are limited to those set forth in the provisions that follow, rather than the provisions for current employees or other retirees.  It is important to note that pre-1967 retirees received lesser health benefits than current employees and other retirees.  In light of this fact, ensuring that pre-1967 retirees know that the content of their health benefits is set forth in a separate section is logical.

For those reasons, the Court concludes that there is no patent ambiguity in the CBAs or insurance agreements.  Such a finding must lead the Court to conclude that Plaintiffs should lose their challenge to Rexnord's 2003 change to their health benefits unless they can show a latent ambiguity through objective evidence.

Plaintiffs argue that there is objective evidence of a latent ambiguity here.  Specifically, Plaintiffs contend that when FMC sold the Indianapolis plant to PTC, FMC made it a priority to ensure that PTC assumed FMC's obligations with respect to retiree health benefits.  Plaintiffs assert

that there would be no reason to do this if FMC believed it had no obligation to provide lifetime health benefits to retirees.  In addition, Plaintiffs state, FMC's continuation of retiree benefits during two union strikes, and PTC's similar treatment during a single strike in 1985, also evidences that Defendants believed retiree health benefits did not expire with the CBAs or insurance agreements. Pls.' Resp. to FMC Defendants' Mot. for Summ. J. at 29 (citing *Bower v. Bunker Hill Co.*, 725 F.2d 1221, 1225 (9th Cir. 1984); *Int'l Union, United Auto., Aero. & Ag. Implement Workers of Am. & its Local 784 v. Cadillac Malleable Iron Co.*, No. G82-75-CA1,1982 WL 20483, at *4-5 (W.D. Mich. Apr. 28, 1982), *aff'd*, 728 F.2d 807 (6th Cir. 1984); *Golden v. Kelsey-Hayes Co.*, 959 F. Supp. 1173, 1179, 1187-88 (E.D. Mich. 1997); *Mioni v. Bessemer Cement Co.*, 123 L.R.R.M. 2492 (W.D. Pa 1985)).

The Court disagrees with Plaintiffs that these facts support a finding of a latent ambiguity that would support admission of extrinsic evidence in this case.  "A latent ambiguity is '[a]n ambiguity that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed.'"  *Cherry*, 441 F.3d at 484 (quoting BLACK'S LAW DICTIONARY 88 (8th ed. 2004)).  According to the Seventh Circuit, a latent ambiguity must be shown with objective evidence, not self-serving testimony.  *AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 575 (7th Cir. 1995).  "'[O]bjective' evidence . . . can be supplied by disinterested third parties:  evidence that there was more than one ship called *Peerless*, or that a particular trade uses 'cotton' in a nonstandard sense."  *Id.*

FMC's efforts to ensure that PTC assumed FMC's obligation under the then-existing CBA and insurance agreements when PTC purchased the Indianapolis plant was a necessary part of the bargaining process.  The CBA in force at the time did not run with the ownership of the Indianapolis

23

plant; it was an agreement between FMC and the Unions.  The documents Plaintiffs point to as evidence of FMC's intent to get PTC to accept FMC's obligations to retired employees under the CBAs do not support an inference that FMC knew the obligations for health benefits to retirees was vested.  *See* Pls.' Exs. 30-32.  The documents merely evidence FMC and PTC's negotiations to ensure in their agreement that PTC would assume FMC's obligations under the CBAs to retirees when PTC purchased the Indianapolis plant.  The plan of merger provided for that.  *See* Pls.' Exh. 27, Art. I, ¶ C.

The Court also disagrees with Plaintiffs' assertion that payment of retiree health benefits during strikes evidence a latent ambiguity about vesting of those benefits.  Although the Sixth and Ninth Circuits have found such a situation creates a triable issue of fact, those cases are distinguishable.  The Sixth Circuit does not apply a presumption against vesting of healthcare benefits like the Seventh Circuit, rather the Sixth Circuit applies the opposite presumption.  *See Int'l Union, United Auto., Aero. & Ag. Implement Workers v. Yardman, Inc.*, 716 F.2d 1476 (6th Cir. 1983) (holding that retiree medical benefits are presumed to be lifetime benefits).  Moreover, in the only case affirmed by the Sixth Circuit on this issue, it appears that the CBAs and corresponding insurance agreements between the parties did not have explicit termination clauses like the CBAs and insurance agreements in the instant case.  *Cadillac Malleable Iron*, 1982 WL 20483, at 5.

Similarly to the case in the Sixth Circuit, in the Ninth Circuit case, the CBA and plan documents did not have a specific expiration date.  *Bower*, 725 F.2d at 1223.  The *Bower* court also concluded that other intrinsic evidence, such as comparison to other parallel contractual provisions, did not provide insight into the duration of the healthcare benefits at issue.  *Id.* at 1223-24.  Without intrinsic evidence to establish the intent of the parties, the Ninth Circuit concluded that it must look

24

to extrinsic evidence to resolve the ambiguity.  *Id.* at 1224.  That is certainly not the circumstance here where the Court has concluded that the intrinsic evidence is clear.

The Court concludes that certain Defendants' payment of retiree healthcare benefits during strikes does not create an ambiguity that would create an inference that Defendants considered retiree healthcare benefits vested.  There is no doubt that retiree benefits are a permissive rather than mandatory subject of collective bargaining.  *See Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157 (1971).  Further, there is no evidence that retirees were active participants in the strikes in question.  Therefore, any discontinuation in their benefits would be counterproductive for the employers because it could antagonize the retirees to join the strike, but add to the logistical issues related to informing retirees of discontinuation of benefits, then re-enrolling them when the strike concluded.

For the foregoing reasons, the Court concludes that there is no objective evidence of a latent ambiguity that would convince the Court to consider extrinsic evidence on the issue of whether the relevant CBAs and insurance agreements provided vested health benefits for retirees.  Plaintiffs other arguments rely upon questions of fact in extrinsic evidence.  The Court has concluded that there are no patent or latent ambiguities in this case that require admission of extrinsic evidence.  Therefore, summary judgment is appropriate on Plaintiffs' claims against Defendants.

## V. **CONCLUSION**

For the reasons stated herein, the Court **GRANTS in part and DENIES** in part defendants',

Link-Belt Company, FMC Corp., PT Components, Inc., and Rexnord Corporation, Motions for

Summary Judgment.  Plaintiffs' complaints are **DISMISSED on the MERITS with prejudice**.

IT IS SO ORDERED this 28th day of September, 2007.


LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana


Electronically distributed to:

Gary J. Dankert
ICE MILLER LLP
gary.dankert@icemiller.com

Raymond W. Martin
WHEELER TRIGG KENNEDY LLP
martin@wtklaw.com

Kimberly Denise Jeselskis
MACEY SWANSON AND ALLMAN
kjeselskis@maceylaw.com

Scott D. Matthews
ICE MILLER LLP
scott.matthews@icemiller.com

Nora L. Macey
MACEY SWANSON AND ALLMAN
nmacey@maceylaw.com

Andrew M. McNeil
BOSE MCKINNEY & EVANS, LLP
amcneil@boselaw.com

Byron L. Myers
ICE MILLER LLP
byron.myers@icemiller.com

Marcia Denise Pintzuk
FMC CORPORATION
marcia_pintzuk@fmc.com

Ryan McCabe Poor
ICE MILLER LLP
poor@icemiller.com

David L. Swider
BOSE MCKINNEY & EVANS, LLP
dswider@boselaw.com

Richard J. Swanson
MACEY SWANSON AND ALLMAN
rswanson@maceylaw.com

George V. Trumbull
FMC CORPORATION
gvtrumbull@att.net